UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CV 3041

------------------------------------------------------------X

VINCENT EMILIO, individually and on behalf
of all others similarly situated,

                    Petitioner,

        -vs.-

SPRINT SPECTRUM L.P. d/b/a/ SPRINT PCS,

                  Respondent.

------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:

No. _____

**PETITION TO CONFIRM
ARBITRATION AWARD
AND FOR RELATED
RELIEF**

ECF Filed

RECEIVE
MAY – 4 2011
U.S.D.C. S.D.N.Y.
CASHIERS

      Petitioner Vincent Emilio ("Petitioner"), individually and on behalf of all others similarly

situated, by his undersigned attorneys, upon personal information and/or upon information and

belief, for his Petition for an Order and Judgment, pursuant to Chapter 1 of the Federal

Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.,* (a) confirming the March 10, 2011 Partial Final

Award (the "Award") issued by the Honorable Kathleen A. Roberts, the Arbitrator in the

arbitration between Petitioner and Respondent Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint"

or "Respondent") in the JAMS arbitration forum, (b) directing, in accordance with the Award,

that Petitioner's claims against Sprint proceed in this Court as a putative class action, and (c)

granting such other and further relief as the Court deems just and proper, alleges as follows:

**THE PARTIES**

      1.    Petitioner Emilio is a resident of the City of Mount Vernon, County of

Westchester, New York. Petitioner is a Sprint wireless telephone service customer who has been

charged and paid to Respondent the New York State Excise Tax which is the subject of the

claims that were asserted by Petitioner in the arbitration in the JAMS arbitration forum captioned

*Emilio, Vincent v. Sprint Spectrum L.P. d/b/a Sprint PCS, Binding Arbitration Reference #*

1425000444 (the "Arbitration") – the Arbitration in which the Award that is the subject of this Petition to Confirm was issued.

2.     Respondent Sprint is a Delaware limited partnership with its principal offices located in Kansas.  Sprint is wholly owned by Sprint Nextel Corporation, a Kansas corporation with its principal executive offices located in Overland Park, Kansas.  Sprint is a global telecommunications company offering, among other services, wireless telephone services.  It is conservatively estimated that more than 2 million New York customers comprise the class that Petitioner seeks to represent as class representative in connection with Sprint's conduct regarding its imposition of the New York State Excise Tax.

## JURISDICTION AND VENUE

3.     (a)     This Court has jurisdiction over this Petition pursuant to 9 U.S.C. § 9, which authorizes Petitioner to apply for an order confirming the Award, and 28 U.S.C. § 1332(d) (the Class Action Fairness Act of 2005), because (i) the number of members of the proposed class Petitioner seeks to represent is 100 or more, (ii) there is diversity of citizenship between any one member of the class (named and unnamed) and Respondent, *viz.,* Petitioner is a citizen of New York State while Respondent Sprint is a citizen of Delaware and/or Kansas; and (iii) the amount in controversy – which may be calculated by aggregating the claims of the putative class members – exceeds $5 million.

(b)     Additionally or alternatively, the Court has diversity jurisdiction over this Petition under 28 U.S.C. § 1332(a), because Petitioner and Respondent are citizens of different states, and the matter in controversy, based on the amounts Petitioner seeks against Respondent as damages, disgorgement and/or restitution, and the attorney's fees to which Petitioner is

statutorily entitled under the Kansas Consumer Protection Act ("KCPA"), exceed the sum or value of $75,000, exclusive of interest and costs.

4.      Venue is proper in this District pursuant to 9 U.S.C. § 9, in that the Award was made in this District, and thus this District has jurisdiction to enter judgment against Sprint on the Award.

## FACTS

5.      Petitioner filed his initial Demand for Class Action Arbitration in January 2005, asserting claims for violations of New York Tax Law § 186-e, New York General Business Law § 349, and unjust enrichment.

6.      Annexed to Petitioner's initial Demand was a copy of the Customer Agreement including the Arbitration Agreement governing the arbitration obligations between Petitioner and Respondent (Exhibit A annexed hereto). The Arbitration Agreement (Ex. A at 7-8 of 13) specifically provides, in relevant part, as follows:

> **MANDATORY ARBITRATION OF DISPUTES.**  INSTEAD OF SUING IN COURT, YOU AND SPRINT AGREE TO ARBITRATE ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES AGAINST EACH OTHER ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . ("CLAIMS"). THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT AND ITS PROVISIONS, NOT STATE LAW, GOVERN ALL QUESTIONS OF WHETHER A CLAIM IS SUBJECT TO ARBITRATION.  THIS PROVISION DOES NOT PREVENT YOU OR SPRINT FROM BRINGING APPROPRIATE CLAIMS IN SMALL CLAIMS COURT, BEFORE THE FEDERAL COMMUNICATIONS COMMISSION OR A STATE PUBLIC UTILITIES COMMISSION.
>
> YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY IN A LAWSUIT OR OTHER PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS; AND THAT NEITHER YOU NOR SPRINT WILL ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE.  IF FOR ANY REASON THIS ARBITRATION

PROVISION DOES NOT APPLY TO A CLAIM, WE AGREE TO WAIVE TRIAL BY JURY.

A single arbitrator engaged in the practice of law will conduct the arbitration. The arbitration will be filed with and the arbitrator will be selected according to the rules of either JAMS or the National Arbitration Forum ("NAF"), or, alternatively, as we may mutually agree.  We agree to act in good faith in selecting an arbitrator.  The arbitration will be conducted by and under the then-applicable rules of JAMS or the NAF, wherever the arbitration is filed or, if the arbitrator is chosen by mutual agreement of the parties, the then-applicable rules of JAMS will apply unless the parties agree otherwise.  All expedited procedures prescribed by the applicable rules will apply.  We agree to pay our respective arbitration costs, except as otherwise required by rules of JAMS or NAF, as applicable, but the arbitrator can apportion these costs as appropriate.  The arbitrator's decision and award is final and binding, and judgment on the award may be entered in any court with jurisdiction.

7.     In March 2005 the Honorable Kathleen A. Roberts was appointed as the Arbitrator of the Arbitration.  JAMS Comprehensive Rule 11 and/or JAMS Streamlined Rule 8, incorporated by Respondent in its Arbitration Agreement, both provide, in relevant part, as follows:

(a)     Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

\*   \*   \*

(c)     Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

8.     During February 2006, the parties submitted letter briefs to Judge Roberts on the issue of the enforceability of the class action preclusion clause in Sprint's Arbitration Agreement under the applicable law.  A telephonic Hearing on that issue with Judge Roberts lasting several hours was held on May 30, 2006.

9.     Consistent with discussions among Judge Roberts and counsel for the parties during the May 30, 2006 Hearing, Petitioner on June 2, 2006 filed a request to amend his arbitration demand specifically adding a claim under the KCPA (Kansas is the governing state law specified by Sprint in the Customer Agreement, *see* Ex. A at 8 of 13), and accompanied his request with his First Amended Demand for Class Action Arbitration.  By email dated June 9, 2006, Respondent stated that it did not oppose the amendment request, but did reserve all of its rights and defenses regarding the amended claims asserted by Petitioner.

10.     On October 25, 2006, Judge Roberts issued her Decision on Enforceability of Class Action Preclusion Clause (the "October 25, 2006 Decision") (Exhibit B annexed hereto). Judge Roberts held as follows (*see* Ex. B at 8-9):

> Kan. Stat. 50-634 sets forth the "private remedies" available to consumers under the KCPA.  "A consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice," Kan. Stat. 50-634(2)(d).  "Whether a consumer seeks or is entitled to damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief" against an act or practice that violates the KCPA, Kan. Stat. 50-634(2)(d).  The KCPA further provides that "[e]xcept as otherwise provided in this act, a consumer may not waive or agree to forego rights or benefits under this act."  Kan. Stat. 50-625.  There is no exception to this provision in the KCPA that pertains to waiver of the right to bring a class action.

> Based upon the clear provisions of the KCPA, I find that the class action preclusion provision in the Arbitration Agreement is unenforceable because it violates the anti-waiver provisions of Kan. Stat. 50-625.

11.     Judge Roberts additionally held in the October 25, 2006 Decision (Ex. B at 6 n.1) that she had jurisdiction to resolve the dispute regarding the enforceability of the class action preclusion clause, both under the broad provisions of the Arbitration Agreement and under the relevant JAMS rules incorporated under the Arbitration Agreement, including JAMS Comprehensive Rule 11(c) and/or JAMS Streamlined Rule 8(c) (quoted *supra*).

12.     After Judge Roberts issued her October 25, 2006 Decision holding that the class action preclusion clause was unenforceable under Kansas law, Sprint attempted to assert a settlement release that was included in the final order approving a Kansas state court class action (the "*Benney/Lundberg* Settlement") as a defense to Petitioner's claims in the Arbitration.  By Decision dated and issued July 16, 2008 (the "July 16, 2008 Decision"), Judge Roberts denied Respondent's motion seeking to apply the *Benney/Lundberg* Settlement release to Petitioner's claims in the Arbitration, holding, *inter alia,* that the *Benney/Lundberg* Settlement could not satisfy the constitutional requirement of "adequacy of representation" as applied to Petitioner's claims.[1]

13.     After Judge Roberts issued the July 16, 2008 Decision, Sprint filed a motion on August 8, 2008 in the Kansas state court that had previously approved the *Benney/Lundberg* Settlement seeking to enjoin Petitioner from continuing to arbitrate or litigate Petitioner's individual and class claims against Respondent in the Arbitration in the JAMS arbitration forum or in any other judicial forum.

14.     On August 11, 2008, Petitioner filed a Petition in this Court to compel Sprint to continue arbitrating the Arbitration in the JAMS arbitration forum, and to enjoin Sprint from proceeding in the Kansas state court.  By Memorandum Order dated November 6, 2008, United States District Judge Barbara S. Jones granted Petitioner's motion to compel arbitration and enjoined Sprint from proceeding in the Kansas state court.  *Emilio v. Sprint Spectrum L.P.,* No. 08 CV 7147, 2008 WL 4865050 (S.D.N.Y. Nov. 6. 2008).  The Second Circuit affirmed Judge

---

[1]     The United States Court of Appeals for the Ninth Circuit reached the same conclusion regarding the lack of "adequacy of representation" when Sprint sought to assert the *Benney/Lundberg* Settlement as a defense to claims similar to Petitioner's regarding the Washington State business and occupation tax.  *See Hesse v. Sprint Corp.,* 598 F.3d 581 (9th Cir.), *cert. denied,* 131 S. Ct. 506 (2010).

Jones' Order in its entirety. *Emilio v. Sprint Spectrum L.P.,* 315 Fed. Appx. 322 (2d Cir. Mar. 12, 2009).

15.     After the Second Circuit affirmed Judge Jones, the parties then returned to the JAMS arbitration forum for further Arbitration proceedings.  During the remainder of 2009, the parties engaged in discovery and then briefing relating to Petitioner's motion for class certification.  After the completion of briefing and while Petitioner's class certification motion was pending, the parties engaged in settlement discussions, and jointly requested that Judge Roberts delay in deciding Petitioner's class certification motion while the discussions continued. The settlement discussions ultimately were unsuccessful, and Judge Roberts was so advised by the parties on October 18, 2010.

16.     On April 27, 2010, while the parties had been in the middle of their settlement discussions, the United States Supreme Court issued its decision in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 130 S. Ct. 1758 (2010) ("*Stolt-Nielsen*"), essentially holding that a party could not be compelled to engage in class action arbitration where there was no basis for class action arbitration under the relevant agreement and applicable law.  On October 19, 2010 (the day after the parties advised Judge Roberts that their settlement discussions ended unsuccessfully), Sprint filed a motion based on *Stolt-Nielsen* requesting that Judge Roberts reconsider her October 25, 2006 Decision holding that Sprint's class action preclusion clause was unenforceable under the KCPA and that Petitioner was entitled to proceed in the Arbitration on a class-wide basis.

17.     Sprint's reconsideration motion was fully briefed, and on December 27, 2010 Judge Roberts issued her Decision (the "December 27, 2010 Decision") (Exhibit C annexed hereto).  In essence, Judge Roberts decided three issues in the Decision: (i) *Stolt-Nielsen* "says

nothing about preemption [under the FAA] or the unenforceability of class preclusion provisions based upon state law," *see* Ex. C at 5-6 (citing multiple decisions supporting her conclusion, including the Second Circuit decision in *Fensterstock v. Educ. Fin. Partners,* 611 F.3d 124, 133 (2d Cir. 2010)); (ii) under *Stolt-Nielsen,* "Sprint cannot be compelled to proceed with class-wide arbitration," *see* Ex. C at 7; and (iii) "that [Petitioner] cannot be compelled to proceed with bilateral arbitration, and must be given the opportunity to pursue his class claims in a court action," *id.* Specifically in connection with the latter two issues, Judge Roberts stated as follows:

> Relying on *Fensterstock,* Sprint argues that Sprint cannot be compelled to arbitrate on a class-wide basis, and that "[e]ven if the Arbitrator were to give the class action waiver no effect, what would remain is an arbitration agreement that is silent as to the issue of class arbitration (as was the case in *Stolt-Nielsen*), and the Arbitrator would still be compelled to direct the parties to proceed with a bilateral arbitration." This proposal, however, would give Sprint the benefit of a class preclusion provision that has been found unenforceable *and* the benefit of an arbitral forum. In essence, Sprint proposes that the Arbitration Agreement be enforced as written, notwithstanding the finding of unenforceability. Neither *Stolt-Nielsen* nor *Fensterstock* supports such a result. (emphasis in original)
>
> . . . I therefore find that Sprint cannot be compelled to proceed with a class-wide arbitration, but also that plaintiff cannot be compelled to proceed with a bilateral arbitration, and must be given the opportunity to pursue his class claims in a court action.

18.     During a telephone conference with Judge Roberts on January 28, 2011 regarding her December 27, 2010 Decision, Sprint's counsel stated that Sprint would not agree to continue to participate in class action arbitration, and Petitioner's counsel stated that Petitioner would not agree to participate in solely bilateral arbitration, and instead would proceed with a Petition to Confirm under 9 U.S.C. § 9 after Judge Roberts issued a Partial Final Award. The December 27, 2010 Decision was set forth substantially *verbatim* by Judge Roberts on March 10, 2011 as a Partial Final Award (Exhibit D annexed hereto) – the Award that is the subject of the instant Petition to Confirm.

19.     The Award was subsequently served on all parties by fax and U.S. Mail on March 21, 2011.   Under the applicable JAMS rules, the Award became final for the purpose of commencing a judicial proceeding to confirm, enforce, modify or vacate the Award fourteen (14) calendar days after service, or on April 4, 2011.

WHEREFORE, Petitioner Vincent Emilio prays that the Court enter an Order and Judgment:

(A)     Confirming the Award pursuant to 9 U.S.C. § 9;

(B)     Directing that Petitioner's claims against Sprint proceed in this Court as a putative class action; and

(C)     Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       May 4, 2011

LAW OFFICES OF WILLIAM R. WEINSTEIN

By:   /s/ William R. Weinstein
      William R. Weinstein
500 Fifth Avenue, Suite 1610
New York, NY 10110
(212) 575-2205
wrw@wweinsteinlaw.com

ATTORNEY FOR PETITIONER
AND THE PUTATIVE CLASS

# Exhibit A



## Terms & Conditions

- Important Service/Product Specific Terms
- Terms and Conditions of Service
- Copyright and Trademark
- Digital Millennium Copyright Act
- Security Policy
- Sprint PCS Web Site Privacy Policy

By accessing any areas of this Internet site or by ordering any product or service through the use of this Internet site, user agrees with Sprint PCS that user is bound by the terms set forth below. The terms of this agreement include terms on use of this Internet site, terms on the purchase of products and services, and terms regarding copyright and trademark matters.

"Sprint PCS" means (1) entities controlled by, under common control with or controlling Sprint Spectrum Holding Company, L.P., including without limitation Sprint. , SprintCom Inc., and PhillieCo L.P., (2) any contractual affiliate of the entities in (1) above that are authorized to use the Sprint PCS brand name and which either sell wireless services or manage a portion of the Sprint PCS wireless network, and (3) any entity which is a member of the PCS Group as defined from time to time by Sprint Corporation.

### Important Service/Product Specific Terms

Your Agreement with Sprint PCS includes terms of your service plan (including those outlined below) and the most recent Sprint PCS Terms and Conditions of Service ("Ts and Cs") - carefully read these all terms which include, among other things, a MANDATORY ARBITRATION of disputes provision. For business customers only, your Agreement with Sprint also includes (a) the Sprint Standard Terms and Conditions for Communication Services ("Standard Terms and Conditions"), and (b) the Wireless Services Product Annex ("Product Terms and Conditions"), both as posted at www.sprint.com/ratesandconditions on the date you signed your wireless service agreement. In the event of conflicting terms or inconsistency for business customers only, your wireless service agreement controls followed by the Product Terms and Conditions, then the Standard Terms and Conditions. For business customers, dispute resolution procedures are described in the Standard Terms and Conditions.

**Term Agreements:** If your Agreement requires you to keep a phone active/maintain a line service for a minimum Term, the Term begins on the phone activation date; for customers changing service plans, the Term begins when the new service plan is selected. You may terminate any line of service before its Term ends by calling *2, however you will be responsible for an EARLY TERMINATION FEE of $150 ("Fee") for each line of service terminated early. Business customers are only liable for the Fee on lines of service that are the responsibility of the business. Business customers are not liable for the Fee on lines of service that are the responsibility of any employees. You do not have to pay the Fee if you terminate under our return policy or where the Ts and Cs allow you to do so without the Fee. Payment of the Fee does not satisfy other outstanding obligations owed to us, including maintaining Term Commitments on other lines of service, or service or equipment related charges.

**Service Provisions:** Coverage is not avai'l everywhere. See our mapping brochure or visit our website for approximate outdoor coverage information. Plans are subject to credit approval. Prices do not include taxes, national Sprint surcharges such as a USF charge and cost recovery fees of $0.65, and local Sprint surcharges of up to 15% in certain areas but in most instances less than 2%. Surcharges are not taxes or government required charges. Call 1-866-770-6690 for the up to date amount of the USF charge and information on cost recovery charges. A non-refundable $36.00 phone activation fee

applies to new activations, certain service plan changes or upgrades of equipment. A deposit of up to $500 may be required to establish service. Service requires a phone compatible with our network. Monthly service charges are not refundable if service is terminated before your billing cycle ends.

**Basic Services:** All phone usage, including incoming and outgoing calls, incur charges. Unused plan minutes do not carry forward. Except with certain plans, included plan minutes are not good for local or long-distance off network roaming calls. International roaming rates will vary. On a call that crosses time periods, minutes are deducted or charged based on the call start time. Calls are rounded up to the next whole minute. Sprint PCS to PCS Calling only avai'l on calls placed directly between separate Sprint PCS Phones (not through voicemail, Directory Assistance, or other indirect methods) while each are on the Sprint Nationwide PCS Network.

**Sprint PCS Vision Services:** Services require a Sprint PCS Vision Phone or device and are not avai'l while roaming off the Sprint Nationwide PCS Network. Data usage is calculated on a per kilobyte basis and rounded up to the next whole kilobyte. Kilobyte usage will be rounded up to the next full cent. Rounding occurs at the end of each session or each clock hour and, at that time, we will deduct accumulated data usage from your plan, or assess overage or casual usage charges. You are responsible for all data activity from and to your phone/device, regardless of who initiates the activity. Estimates of data usage will vary from actual use. In certain instances, we may delete premium and non-premium items downloaded to avai'l storage areas (e.g., personal vault), including any pictures, games, ringers or screen savers. Your invoice will not separately identify the number of kilobytes attributable to your use of specific sites, sessions or services used. Premium Services (games, ringers, etc.) priced separately.

**Sprint PCS Vision.** Not avai'l where use is in connection with server devices or host computer applications, other systems that drive continuous heavy traffic or data sessions, or as substitutes for private lines or frame relay connections. Sprint PCS Vision Packs are not avai'l: (1) with any other device used in connection with a computer or PDA - including phones, smart phones or other devices used with connection kits or similar phone-to-computer/PDA accessories; and (2) with Bluetooth Vision capable PCS Phones used as a modem in connection with other devices. Sprint reserves the right to deny or to terminate service without notice for any misuse. Credits for premium services do not carry forward and are not avai'l for use with all services.

**Roaming Included Plans.** Not avai'l with single-band or digital mode only phones, or to customers residing in an area not covered by the Sprint Nationwide PCS Network. Sprint may terminate service if a majority of minutes in a given month are used while roaming off the Sprint Nationwide PCS Network. International calling including in Canada & Mexico, not included. Usage in Expanded Voice Coverage areas may, in some instances, be invoiced after 30-60 days. When calling from Expanded Voice Coverage Areas: (a) PCS Vision and PCS to PCS calling services are not avai'l; and (b) certain calling features (Voicemail, Caller I.D., Call Waiting, etc.) may not work.

**Add-a-Phone.** Requires a minimum two-year Term agreement for each phone/line of service added ("Secondary Line"). The first phone activated on the service plan ("Primary Line") and Secondary Lines may have different Term commitment end dates. If the Primary Line on the account is terminated prior to the expiration of the Term of any Secondary Line, a Secondary Line must move to the Primary Line position.

**Voice Command.** Not avai'l while roaming off the Sprint Nationwide PCS Network. Calls to 911 or similar emergency numbers cannot be placed through Voice Command. You may dial "911" on your phone in an emergency. Airtime and applicable long distance charges begin when you press or activate the TALK or similar key.

**Roadside Rescue.** Must be with vehicle and have your Sprint PCS Phone with you at the time of service. Limit 4 calls per program year (starts when service is added to your account). Allow approx. 72 hours to provision service to your account. Covers light passenger cars &

trucks. Excludes RVs, motorcycles, boats, trailers, limousines, taxis and commercial or heavy-duty vehicles. This is not a reimbursement service and is not valid when operating vehicle off-road. Services are provided by AAA, AAA clubs, CAA clubs and, in CA, the National Automobile Club. Sprint is not a motor club.

**Sprint PCS International and Sprint PCS Call Canada:** For verification purposes, activation of plan may take approximately 1 to 3 days, additional information may be required during verification process.

**2 Month Free Offers.** If you do not wish to continue with the service after the initial 2 months, you must contact us prior to the billing end date of your second invoice to avoid charges. Additional charges apply for premium content.

**Sprint PCS Risk-Free Guarantee.** Requires return of your complete, undamaged Sprint PCS Phone with the original retailer's proof of purchase within 14 days (30 days for California residents). You must still pay all charges based on actual usage (partial monthly service charges, taxes and Sprint surcharges).

**Sprint PCS Clear Pay Program.** In most instances a deposit between $125 and $500 applies. We may require a deposit of up to $1000 in certain instances. A preset account spending limit of between $125 and $500 will apply - ask the specific amount. We may limit the number of phones you can activate on your account. Monthly service plan charges accrue even if your service is turned off, when you exceed your spending limit or in instances of nonpayment. Roaming usage may be invoiced after 30 - 60 days.

Top of page

## Sprint PCS Terms and Conditions of Service

A Para solicitar esta literatura en español, por favor contactar a 1-888-211-4PCS(4727).

**General.** This agreement ("Agreement") covers the terms on which we agree to provide and you agree to accept any service or product we make available to you, including your wireless services, wireless devices, etc. (collectively "Services"). You accept this Agreement when you do any of the following: (a) provide your written or electronic signature; (b) accept through an oral or electronic statement; © attempt to or in any way use any of the Services; (d) pay for any Services; or (e) open any materials or package that says you are accepting when you open it. The Agreement includes the terms in this document together with the terms associated with the Services you select (as described in our marketing materials, e.g., service plan brochures, or on our website). You represent that you are at least 18 years old. In this document, we use the words "we," "us," "our" or "Sprint" to refer to Sprint Spectrum L.P. and its affiliates doing business as Sprint PCS.

**Agreement.** We may change the Agreement at any time with notice. Any changes to the Agreement are effective when we publish them. If you use our Services or make any payment to us on or after the effective date of the changes, you accept the changes. If we change a material term of the Agreement and that change has a material adverse effect on you, you may terminate the Agreement without an Early Termination Fee by calling 1-888-567-5528 within 30 days after the changes go into effect. You understand and agree that taxes, Universal Service fees and other charges imposed by the government or based on government calculations may increase or decrease on a monthly basis, and that this paragraph does not apply to any increases in such taxes, Universal Service fees or other charges.

**Activating Service.** Before activation, we may check your credit and verify your identity. You must have and maintain satisfactory credit to receive and continue to receive Services. We may charge a nonrefundable activation fee, deposit, prepayment or other fee to establish or maintain Services.

**Term Commitments.** Unless we specifically tell you otherwise, our

service plans require that you maintain service for a minimum term ("Term Service Plan"), usually 1 or 2 years. After satisfying this minimum term, your service plan will continue on a month-to-month basis unless you have agreed to extend the term for additional period (s). Certain service, promotional or product offers may require that you agree to or extend a Term Service Plan. As discussed below, we may charge you an Early Termination Fee if you deactivate a Term Service Plan before the end of the term.

**Using Services.** You agree to not use our Services in an unlawful, fraudulent or abusive manner. You may not resell or lease Services to anyone. Sprint is not responsible for any opinions, advice, statements, services applications or other information provided by third parties and accessible through our various Services, including the internet. Neither Sprint, its vendors or licensors guarantees the accuracy, completeness or usefulness of information that is obtained through these Services. You are responsible for evaluating such content. **You are also responsible for any use of our Services through any wireless device on your account including, but not limited to, use by children or minors. We strongly recommend that you closely monitor any such usage.**

**Changing Services.** Changes to Services will generally be effective at the start of your next full invoicing cycle. In certain instances, the changes may take place sooner, in which case your invoice will reflect pro-rated charges. Certain changes may be conditioned upon payment of an Early Termination Fee or certain other charges.

**Termination of Services.** Consistent with this Agreement: (a) we may terminate Services at any time with notice to you and, in certain instances, without notice; and (b) you may terminate Services at any time with prior notice to us. Except as otherwise provided in this Agreement, IF YOU TERMINATE YOUR **TERM SERVICE PLAN** EARLY, OR WE DO SO FOR GOOD CAUSE, YOU WILL BE REQUIRED TO PAY THE APPLICABLE EARLY TERMINATION FEE ASSOCIATED WITH YOUR SERVICES. We will not charge an Early Termination Fee for deactivations consistent with our Return Policy or for service plans being provided on a month-to-month basis. If any Services are terminated before the end of your current invoicing cycle, we will not prorate charges to the date of termination, and you will not receive a credit or refund for any unused Services.

**Wireless Devices, Numbers & E-mail Addresses.** We did not manufacture your wireless device and we are not responsible for any defects or for the acts or omissions of the manufacturer. The only warranties on your device are any limited warranties extended by the manufacturer directly to you or passed on to you through us. Your device may not accept Services directly from any other carrier. You do not have any rights to any number, e-mail address or other identifier we may assign to your device or account; you may not modify, change or transfer any of these except as we allow or as allowed for by law. In certain instances, you may transfer your number from another carrier to us, or from us to another carrier. We do not guarantee that transfers to or from us will be successful. If you transfer your number away from us, the terms of this Agreement (e.g., Early Termination Fee, etc.) still apply. If a transfer to Sprint is not successful, you will be responsible for any discounts provided to you with the purchase of your device. See our printed in-store materials or visit www.sprintpcs.com for additional important information on number transfers.

**Coverage.** Available coverage areas for Services are generally identified in our mapping brochures and at www.sprintpcs.com. This may include coverage on our digital network (the "Sprint Nationwide PCS Network") as well as coverage we make available to you through agreements with other carriers ("off network" or "roaming" coverage). **All coverage maps are high level representations of outdoor coverage and there are gaps in coverage within areas shown as covered on the maps. Coverage is not available everywhere, nor can we guarantee you will receive coverage at all times, or without interruptions or delays (e.g., dropped calls, blocked calls, etc.) in the coverage areas we identify. Actual coverage and quality of Services may be affected by conditions within or beyond our control, including network problems, software, signal strength, your equipment, structures (including buildings in which you may be located), atmospheric, geographic, or topographic conditions.**

**Roaming Coverage.** You are roaming anytime your phone indicates that you are roaming. Roaming coverage is only available with certain devices and, unless included as part of your Services, will result in additional charges. Roaming calls placed "manually" (through an operator or with a credit card) will always incur separate and additional charges. Depending on your phone settings, you may automatically roam if there is a gap or interruption in coverage within the Sprint Nationwide PCS Network coverage area and roaming coverage areas. See your phone guide for how to adjust phone settings. Certain features and services may not be available in roaming coverage areas (including PCS Vision, voicemail, call waiting, call forwarding, etc.).

**Charges.** Carefully review the terms of your Services. You will be assessed charges based on the terms of your Services including, without limitation, monthly recurring charges and charges based on actual usage (e.g., charges for long distance, roaming, call forwarding, directory assistance, etc.). Airtime and other time based usage charges are calculated from when your device first initiates contact with a network until the network connection is broken, whether or not you were actually successful in connecting to the intended destination. However, you will not be charged for voice calls that ring and do not pick up, or if you get a busy signal. For voice calls received by your device, you are charged from the time shortly before the phone starts ringing until the call is terminated. You are charged for an entire voice call based on the time period in which the call is initiated. Partial minutes of use are rounded up to the next minute.

**Sprint PCS Vision Charges.** Vision usage is measured in bytes, not in minutes. Bytes are rounded up to kilobytes. Usage occurs at the top of each clock hour while in a session and at the end of each session and is then charged to you based on the terms of your Services. Depending on your Services, usage may be charged against an allowance or on a fixed price per kilobyte. Usage charges may be rounded up to the next cent at monthly or other intervals. In certain instances, you may not know that your session has not ended. As long as your device is connected to our network, you will incur data usage charges. You will be charged for all data directed to the internet address (or "IP address") assigned to your device, regardless of who initiates the activity or whether your device actually receives the data. This includes, but is not limited to, the amount of data associated with the particular information/item (e.g. game, ringer, email, etc.), additional data used in accessing, transporting and routing this information/item on our network, data from partial or interrupted downloads, re-sent data, and data associated with unsuccessful attempts to reach websites or use applications. Based on these and a number of other factors (e.g., the specific application, network performance, etc.) data used and charged to you will vary widely, even for the same activity. Estimates of data usage - for example, the size of downloadable files - will not be accurate or a reliable predictor of actual usage. Your invoice will not separately identify the number of kilobytes attributable to your use of specific sites, sessions or services.

**Taxes and Surcharges.** We invoice you for taxes, fees and other charges levied by or remitted directly to federal, state, local or foreign governments including, without limitation, sales, gross receipts, Universal Service, use, and excise taxes. If you claim any tax exemption, you must provide us with a valid tax-exempt document. Tax exemptions are not applied retroactively. We also invoice you for surcharges that we collect and keep to pay for the costs of complying with government programs such as number pooling and portability, and Enhanced 911 service; these charges are not the taxes nor government imposed assessments.

**Invoicing & Payment.** Invoicing cycles and dates may change from time to time. Monthly recurring and related charges for Services are generally invoiced one invoicing cycle in advance. Other charges are invoiced soon after they are incurred. Most usage is generally applied to the invoicing cycle in which they are incurred, but in some instances may be applied to subsequent invoicing cycles. You are responsible for all charges associated with any device activated on your account, regardless of who used the device. You must pay all charges by the due date on the invoice. **Past due amounts accrue late charges until paid at the rate of 5% per month or at the highest rate allowed by law and may result in immediate suspension of your account.** If you agree to any auto-payment option through banking or credit

account, we may initiate payment from the account for all amounts we invoice you without additional authorization or notice. Based on your credit or payment history, we may require certain forms of guaranteed payment as a condition of maintaining Services. If we invoice you for amounts on behalf of a third-party, payments received are first applied to amounts due to us. You may be charged additional fees for certain methods of payment and for payments denied by a financial institution. Acceptance of payments (even if marked "paid in full") does not waive our right to collect all amounts that you owe us.

**Disputed Charges.** Disputes concerning any charges invoiced must be raised within 60 days of the date of the invoice. You accept all charges not disputed in this time period. Disputes can only be made by calling or writing us as directed on your invoice.

**Account Spending Limit & Deposits.** We may impose an account spending limit ("ASL") on any account without notice. We will notify you of an ASL based on your credit or payment history and may reduce the ASL at any time with prior notice. An ASL should not be relied on to manage usage on your account. We may suspend an account without prior notice when the account balance reaches the ASL, even if the account is not past due. Services can be restored upon payment of an amount that brings the account balance below the ASL and any past due amounts. If we require a deposit for you to establish or maintain an account, we will hold the deposit as partial guarantee of payment for Services. We may change the deposit amount at any time with notice for good reason. Except as we allow, a deposit may not be used to pay any invoice or delay payment. The deposit amount, the length of time we hold the deposit and changes to the deposit amount are determined based on your credit and payment history. The rate of interest, if any, on the deposit is subject to change. We may mix deposits with our other funds. If your account is terminated for any reason, we may without notice apply your deposit to any outstanding charges. We may send any remaining deposit amounts to your last known address within 75 days after account termination. If the funds are returned to us, you may claim these funds for one year from the date of return. Any money held during this one-year period will not accrue interest for your benefit and are subject to a servicing fee charged against the balance. You forfeit any portion of the money left after the one-year period.

**Other Sprint PCS Vision Terms.** You will not receive voice calls while using Vision. Vision is not available for use with server devices or host computer applications, other systems that drive continuous heavy traffic or data sessions, or as substitutes for private lines or frame relay connections. Unlimited Vision plans/options may not be used with Sprint PCS phones or smart phones being used as a modem in connection with other equipment (e.g., computers, etc.) through use of connection kits or other phone-to-computer/PDA accessories, or Bluetooth or other wireless technology. We may terminate services without notice for any misuse. You may have access to certain games, ringers, screen savers and other items on our Vision site ("Premium Services") that are available for an additional charge. You will be billed for Premium Service purchases on your Sprint PCS invoice based on the charges as specified at purchase. Subject to the terms of the content purchased, we may delete premium and non-premium items downloaded to any storage areas we may provide, including any pictures, games and other content. We may limit the amount of Premium Services you may purchase in a specific timeframe (month, week, day, or other time period).

**Voice Command.** Calls to 911 or similar emergency numbers cannot be placed through the Voice Command feature. See our printed in-store materials or visit www.sprintpcs.com for additional important information on this option.

**Wireless Web.** Wireless Web Services may be available depending on your device and Service plan/option. This is not a Vision service. Usage is calculated on minutes used and generally deducts from your Service plan minutes. See our printed in-store materials or visit www.sprintpcs.com for additional important information on this option.

**Lost or Stolen Equipment.** If your device is lost or stolen, please notify us immediately by calling 1-888-211-4PCS. **You are responsible for all charges incurred before you notify us of the loss or theft.** You agree to cooperate reasonably with us in investigating suspected

unlawful or fraudulent use.

**Messaging.** You may incur charges in accessing, sending or receiving messages on your device. We may impose limits on the number of voicemail, text, email or other messages that can be retained through your account. Indicators of messages on your device, including mailbox icons, may not always provide an up to date indication of new messages and you may at times need to manually reset or clear your mailbox indicator. Legitimate messages may be interrupted by software aimed at prevention of SPAM or similar messages.

**Caller ID.** If you do not want people you call to receive the number assigned to your phone, call us at 1-888-211-4PCS for information about automatic Caller ID blocking. The number assigned to your phone can be blocked on a per-call basis by dialing *67 + Destination Number + TALK (or similar key). Caller ID blocking is not available when using Vision or Wireless Web services.

**TTY Access.** A TTY (also known as TDD or Text Telephone) is a telecommunications device that allows people who are deaf or hard of hearing, or who have speech or language disabilities, to communicate by telephone. TTY doesn't work with all devices. If you have a TTY-capable device, it may not function effectively, or at all, when attempting 911 calls and should not be relied on for such calls.

**Disclaimer of Warranties.** WE MAKE NO REPRESENTATIONS OF WARRANTIES, EXPRESS OR IMPLIED, INCLUDING (TO THE EXTENT ALLOWED BY LAW) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE CONCERNING YOUR SERVICES OR WIRELESS DEVICE. WE DO NOT PROMISE UNINTERRUPTED OR ERROR-FREE SERVICES AND YOU AGREE TO HOLD US HARMLESS FOR ALL SUCH PROBLEMS.

**Limitation of Liability.** Neither we nor our vendors, suppliers or licensors are liable for any damages arising out of or in connection with any: (a) act or omission by your, or another person or company; (b) providing or failing to provide Services, including deficiencies or problems with your wireless device, our network coverage or Services (e.g., dropped, blocked, interrupted calls/messages, etc.); © traffic or other accidents, or any health-related claims allegedly arising from the use of Services, any wireless devices or related accessories; (d) content or information accessed while using our Services, such as through the internet; (e) interruption or failure in accessing or attempting to access emergency services from your phone, including through 911, E911 or otherwise; or (f) events due to factors beyond our control, including acts of God (including, without limitation, weather-related phenomena, fire or earthquake), war, riot, strike, or orders of governmental authority. **In the event we are found to be responsible to you for monetary damages relating to the Services (including wireless devices), you agree that any such damages will not exceed the pro-rated monthly recurring charge for your Services during the affected period.**

**NO CONSEQUENTIAL OR OTHER DAMAGES.** UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH PROVIDING OR FAILING TO PROVIDE SERVICES, PHONES OR OTHER EQUIPMENT USED IN CONNECTION WITH THE SERVICES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES. THIS SECTION SURVIVES TERMINATION OF THIS AGREEMENT.

**MANDATORY ARBITRATION OF DISPUTES.** INSTEAD OF SUING IN COURT, YOU AND SPRINT AGREE TO ARBITRATE ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES AGAINST EACH OTHER ARISING OUT OF OR RELATING TO THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE SERVICES, ANY PHONES/EQUIPMENT, OR ADVERTISING, EVEN IF IT ARISES AFTER YOUR SERVICES HAVE TERMINATED, AND INCLUDING CLAIMS YOU MAY BRING AGAINST SPRINT'S EMPLOYEES, AGENTS, AFFILIATES OR OTHER REPRESENTATIVES, OR THAT

SPRINT MAY BRING AGAINST YOU ("CLAIMS"). THE FEDERAL ARBITRATION ACT APPLIES TO THIS AGREEMENT AND ITS PROVISIONS, NOT STATE LAW, GOVERN ALL QUESTIONS OF WHETHER A CLAIM IS SUBJECT TO ARBITRATION. THIS PROVISION DOES NOT PREVENT EITHER YOU OR SPRINT FROM BRINGING APPROPRIATE CLAIMS IN SMALL CLAIMS COURT, BEFORE THE FEDERAL COMMUNICATIONS COMMISSION OR A STATE PUBLIC UTILITIES COMMISSION.

YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY IN A LAWSUIT, ARBITRATION OR OTHER PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS; AND THAT NEITHER SPRINT NOR YOU WILL ASSERT A CLAIM IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANYONE ELSE. IF FOR ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A CLAIM, WE AGREE TO WAIVE TRIAL BY JURY.

A single arbitrator engaged in the practice of law will conduct the arbitration. The arbitration will be filed with and the arbitrator will be selected according to the rules of either JAMS or the National Arbitration Forum ("NAF"), or, alternatively, as we may mutually agree. We agree to act in good faith in selecting an arbitrator. The arbitration will be conducted by and under the then-applicable rules of JAMS or NAF, wherever the arbitration is filed or, if the arbitrator is chosen by mutual agreement of the parties, the then-applicable rules of JAMS will apply unless the parties agree otherwise. All expedited procedures prescribed by the applicable rules will apply. We agree to pay our respective arbitration costs, except as otherwise required by rules of JAMS or NAF, as applicable, but the arbitrator can apportion these costs as appropriate. The arbitrator's decision and award is final and binding, and judgment on the award may be entered in any court with jurisdiction.

If any party files a judicial or administrative action asserting a claim that is subject to arbitration and another party successfully stays such action or compels arbitration, the party filing that action must pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including attorneys' fees.

If any portion of this Mandatory Arbitration of Disputes section is determined to be invalid or unenforceable, the remainder of the Section remains in full force and effect.

**Miscellaneous.** You may notify us by calling us at 1-888-211-4PCS, or use that number to get our current address for written notice. We may send you notice to your last known address in our invoicing records, or by calling leaving you a voice message on your wireless device or home phone. Properly addressed written notice is effective three days after deposit in the U.S. mail, postage prepaid. This Agreement is governed by and must be construed under federal law and the laws of the State of Kansas, without regard to choice of law principles. If either of us waives or fails to enforce any requirement under this Agreement in any one instance, that does not waive our right to later enforce that requirement. If any part of this Agreement is held invalid or unenforceable, the rest of this Agreement remains in full force and effect. Section headings are for descriptive, non-interpretive purposes only. You may not assign this Agreement to any other person or entity without our prior written approval. This Agreement (including any referenced documents and attachments) makes up the entire agreement between us and replaces all prior written or spoken agreements.

Top of page

---

**Copyright and Trademark**

© 1998-2001 Sprint. All rights reserved. Sprint and the diamond logo are registered trademarks of Sprint Communications Company L.P., used under license. Sprint PCS is a service mark of Sprint Communications Company L.P.

This Internet site contains information, data, software, photographs, graphs, videos, graphics, music, sounds and other material (collectively, "Content") that are protected by copyrights, trademarks, trade secrets or other proprietary rights. These rights are valid and protected in all forms, media and technologies existing now or hereafter developed. All Content is copyrighted as a collective work under the U.S. copyright laws, and Sprint PCS owns a copyright in the selection, coordination, arrangement, and enhancement of such Content. User may not modify, remove, delete, augment, add to, publish, transmit, participate in the transfer or sale of, create derivative works from, or in any way exploit any of the Content, in whole or in part. All Content is copyrighted and Sprint PCS owns a copyright in the selection, coordination, arrangement and enhancement of the Content, page headers, custom graphics and button icons.

Sprint PCS grants you permission to copy electronically and to print in hard copy portions of the Content for (1) personal use if you maintain all copyright notices, trademark legends and other proprietary rights notices, (2) using this Internet site as a personal shopping resource, (3) communicating with Sprint PCS about a Sprint PCS product or service, or (4) placing an order with Sprint PCS. Any other use of materials on this site, including reproduction for purposes other than permitted above, uploading, modification or distribution, is prohibited without Sprint PCS' prior written permission.

All other trademarks, product names, and company names and logos appearing on Sprint PCS are the property of their respective owners. User must obtain permission from the those owners before copying or using the owner's trademarks, product names and company names and logos.

Top of page

## Digital Millennium Copyright Act

Sprint PCS respects the intellectual property rights of others and is committed to complying with U.S. Copyright laws. Sprint PCS policy is to respond to notices of alleged infringement that comply with the Digital Millennium Copyright Act. The Digital Millennium Copyright Act of 1998 ("DMCA") provides recourse for owners of copyrighted material who believe their rights under U.S. copyright law have been infringed on the Internet.

Sprint generally provides transitory digital network communications under 17 U.S.C. 512 (a) of the DMCA ("512(a) Service Provider"). Sprint is therefore not obligated to respond to a copyright owner or an agent on behalf of the owner nor does Sprint have a duty to remove or disable access to material transmitted, routed or connected to the Sprint network that is initiated and/or directed by an individual internet user.

If you believe your work has been copied in a way that may constitute copyright infringement and is accessible in a way that may constitute copyright infringement by Sprint as not merely providing transitory digital communications other than as a 512(a) Service Provider under 17 U.S.C. 512(a) of the DMCA, please provide notice to our Designated Agent. The notice must include the following information as provided by the Digital Millennium Copyright Act, 17 U.S.C. 512 (c) (3), in addition the notice should include the basis for your belief that Sprint is not merely providing transitory digital communications under 17 U.S.C. 512 (a) of the DMCA:

- A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;
- Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;
- Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;

- Information reasonably sufficient to permit the service provider to contact the complaining party, such as address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted;
- A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law;
- A statement that the information in the notification is accurate and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

The Designated Agent for notice of copyright infringement claims may be reached as follows:

By Mail:
Timothy A. Nehls
6450 Sprint Parkway
Mailstop: KSOPHN0312-3A418
Overland Park, Kansas 66251

By Fax: (913) 315-9259

By email: copyrightnotice@mail.sprint.com

Counter Notification to Claimed Copyright Infringement
If a copyright infringement notice has been wrongly filed against you as a result of mistake or a misidentification of the material, you may file a counter notification with Sprint PCS Designated Agent. The counter notification must provide the following information:

- Physical or electronic signature of the subscriber;
- Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled;
- A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification;
- The subscribers name, address, telephone number and email address, and a statement that the subscriber consents to the jurisdiction of the Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification or an agent of such person.

Sprint PCS will terminate all account holders and subscribers who are repeat infringers of intellectual property laws.

Top of page

## Security Policy

Sprint PCS uses reasonable precautions to protect the privacy of your credit card and other ordering information by utilizing a Secure Socket Layer ("SSL") connection. Accordingly, your credit card and other ordering information, such as your name and address, is encrypted using the SSL connection and is not expected to be read in an intelligible form as it travels to Sprint PCS' order processing system. Sprint PCS' order processing systems is not connected to the Internet and is not accessible to the public.

Many web browsers support the use of an SSL connection, but if your browser does not support the use of an SSL connection or if you prefer not to send your credit card number over the Internet, you can place your order by calling Sprint PCS toll free at **1-888-253-1315** (U.S. only). Sprint PCS Telesales Representatives are available 7 days a week, Monday through Friday from 6:00 a.m. to 11:00 p.m. and Saturday and Sunday 8:00 a.m. to 6:00 p.m. to take your order.

Top of page

**Sprint PCS Web Site Privacy Policy**

Effective: July 30, 2004

Sprint respects the privacy of its customers, and other individuals and businesses using the Web sites owned and operated by Sprint and its affiliates ("Sprint Sites"). This updated Privacy Policy is posted to keep you informed about the types of information collected on Sprint Sites and how the information is used and protected. The revised Privacy Policy includes information about advertisements on Sprint Sites and access to your account information.

Sprint protects the privacy of its local, long distance and wireless customers consistent with the Federal Telecommunications Act and rules and regulations issued by the Federal Communications Commission.

Sprint's Privacy Policy for its Internet services (including Sprint Vision, wireless Internet access, prepaid dial-up Internet access, and high speed Internet services) can be accessed at: www.sprint.com/privacypolicy/broadbandservices.

There are two types of information that may be exchanged between the Sprint Site and the user during each visit to a Sprint Site. They are:

- General technical data transmitted between your computer and the Sprint Site that does not identify you personally.
- Personally identifiable information that you voluntarily share. The types of personally identifiable information that you might share include your name, address, telephone number, social security card number, e-mail address and credit card number.

ANONYMOUS INFORMATION

In order to provide you with the information and services that you look for from the Sprint Sites, Sprint gathers certain types of information from you that are not personally identifiable. This is called anonymous information and includes:

- The type of Internet browser you use when you visit
- The types of computer operating system you use
- The search engine you use to access the Sprint Sites (such as "AOL.com," "Yahoo.com" or "Go.com")
- The specific Sprint Site that you visit (SprintPCS.com, Sprint.com, etc.).

The anonymous information collected is not associated with you personally or your business. Sprint uses this anonymous information in the aggregate to improve Sprint Sites and the services we provide through those sites.

USE OF COOKIES

Sprint Sites may use "cookies" to collect the anonymous information described in this Privacy Policy. Cookies are bits of encrypted data that are loaded by Sprint's server onto your computer when you visit a Sprint Site. The server can retrieve the cookies the next time you visit a site and use them to identify the computer as a return visitor. Sprint uses cookies to collect non-personally identifiable information and generically track usage patterns on the Sprint Sites in order to monitor activity and administer the sites. Sprint also uses information obtained from cookies to improve Sprint Sites, and make decisions concerning advertising, product offerings and services. Most users can disable cookies from their Internet browsers, receive a warning before a cookie is placed on their computer, and erase all cookies from their computer hard drives by following the instructions provided by the browser.

ADVERTISEMENTS ON SPRINT SITES

Advertising companies deliver ads on some Sprint Sites. You should be aware that when you click on these ads, the advertising companies

may also deploy cookies to receive anonymous information about ad viewing by Internet users on Sprint Sites and other Web sites. This information is associated with your Web browser, but cannot be associated with your name or e-mail address without your permission. Therefore, advertising companies may know where your computer goes on the Web, but they do not know who you are unless you tell them. Sprint does not provide personally identifiable information about its customers or Sprint Site visitors to these advertising companies.

PERSONALLY IDENTIFIABLE INFORMATION

Sprint may ask you to provide what is often referred to as "personally identifiable information" such as your name, address, telephone number, social security number, and e-mail address when you use Sprint Sites to: purchase a service or product online, enter a contest or sweepstakes, ask to receive information, respond to a survey, register with a Sprint Site, access your account, ask for a personalized service, request customer service online, or apply for a job. You always have the alternative of mailing or calling Sprint with the information requested if you do not wish to provide it online. Personally identifiable information provided at a Sprint Site to order Sprint services other than Internet services will be protected in the same manner as when the information is provided by other means such as over the telephone or by mail. We protect customer information obtained from Sprint's local, long distance and wireless service customers consistent with federal laws governing telecommunications services and with regulations issued by the Federal Communications Commission. Sprint's Privacy Policy for its Broadband services can be accessed at: www.sprint.com/privacypolicy/broadbandservices.

We use personally identifiable information provided at a Sprint Site in the following ways unless otherwise specified:

- For its intended purpose (such as to complete an online order for service),
- To provide you with information about new Sprint products and services or products and services offered in conjunction with Sprint business partners.

DISCLOSURE TO THIRD PARTIES

Sprint will not sell personally identifiable information to third parties. We may share information with business partners that assist Sprint in providing you service. We are committed to giving you the choice whether or not we use your information for marketing purposes or share information with business partners for marketing purposes. We will not otherwise disclose to outside parties any personally identifiable information obtained from a Sprint online service or the registration at a Sprint Site without your consent except under the following circumstances:

- When required by law,
- When disclosure is necessary to protect the safety of a customer, third party or Sprint's property,
- If it is required in connection with any sale or transfer of all or a portion of Sprint's assets.

To assist in providing you services, Sprint may share the anonymous information described in this Privacy Policy with third parties from time-to-time. When Sprint uses agents, contractors or other companies to perform services on its behalf, Sprint will require that they protect your personally identifiable information consistent with this Privacy Policy.

E-MAIL COMMUNICATIONS

E-mail is an increasingly popular communication tool through which you and your business may communicate with Sprint. Likewise, Sprint may use e-mail to communicate with you, respond to your e-mail, and to tell you about new products and services. If you do not wish to receive e-mail promotions and new products and service announcements from Sprint, please follow the instructions that appear at the end of the e-mail communication that you receive from Sprint to have your name removed from the list.

SECURITY

Sprint utilizes several encryption methods to ensure that the data you submit on any of the Sprint Sites is secure. Through this "secure session," information that you input into a Sprint online order form will be sent and will arrive privately and unaltered at a Sprint server. This security prohibits access to your information by other companies and Web users.

CHILDREN

Sprint does not intend to collect personally identifiable information from individuals under 18 years of age. If Sprint becomes aware that a user who is under 18 is using a Sprint Site, Sprint will specifically instruct that individual that they are not to submit information on Sprint Sites without a parent or guardian's consent. If a child has provided Sprint with personally identifiable information without Sprint's knowledge, a parent or guardian of the child may contact Sprint at privacy@mail.sprint.com and Sprint will delete the child's information from our existing files.

LINKS

Some Sprint Sites contain links to other Web sites that are owned and operated by parties other than Sprint. Please be aware that this Privacy Policy does not extend to any Web sites other than those owned and controlled by Sprint.

ACCOUNT INFORMATION

If you do not want your personally identifiable information collected, please do not submit it to us. If you have already submitted this information and would like for us to remove it from our records or if you wise to update your information, please contact us at privacy@mail.sprint.com or by telephone or mail. You may verify or update your name, address, e-mail address, telephone number, social security number and/or billing information. Sprint will use reasonable efforts to correct any information that is inaccurate or update our records, as appropriate.

QUESTIONS

If you have questions or comments regarding this Privacy Policy, you may contact us at privacy@mail.sprint.com. If you have submitted personally identifiable information, and would like that information deleted from our records, please contact us at our e-mail address, privacy@mail.sprint.com. We will use reasonable efforts to delete that information from our files.

UPDATES

From time to time Sprint may update its website privacy policy. When it does so, it will post the updated policy on its website, note the effective date of the new policy, and, if the changes are deemed by Sprint to be material, Sprint will provide an overview of the material changes for 30 days after the effective date at the top of the updated policy to provide notice of the changes.

Top of page

Print | Close

# Exhibit B

JAMS NEW YORK

-------------------------------------------------X

Vincent Emilio,

                Claimant,

         -v-                        DECISION ON
                                       ENFORCEABILITY OF

Sprint Spectrum L.P.,                   CLASS ACTION
                                       PRECLUSION CLAUSE

                Respondent.

-------------------------------------------------X

      This Decision addresses the enforceability of a class action preclusion clause contained in an agreement between Claimant and Respondent with respect to the arbitration of disputes regarding wireless telephone services.

<h2 style="text-align:center">BACKGROUND</h2>

      The Arbitration Demand in this case was filed with JAMS on January 4, 2005, by Claimant Vincent Emilio ("Emilio" or "Claimant"), "individually and on behalf of all others similarly situated," against Respondent Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint" or "Respondent"). Claimant is a resident of Mt Vernon, New York. Sprint is alleged to be a "global telecommunications company, structured as a Delaware limited partnership with its principal offices located in Kansas. Sprint is alleged to be wholly owned by Sprint Corporation, a Kansas corporation with its principal executive offices located in Kansas.

      The Arbitration Demand asserts that Respondent charges and collects New York State Excise Tax ("Excise Tax") from wireless telephone customers, even though the obligation to pay Excise Tax under New York law is imposed solely and directly on

1

Respondent, *i.e.*, Respondent is not authorized under New York law to pass this tax obligation on to consumers.

The Arbitration Demand asserts that Claimant brings this class action individually and on behalf of a class comprised of "all persons who, during the period commencing six years prior to the filing of this arbitration demand and continuing to the present (the "Class Period"), were Sprint wireless telephone service customers who paid "New York State Excise Tax" ("Excise Tax(es)") as part of their monthly charges (the "Class")".

The Arbitration Demand asserts that Respondent has "unlawfully, deceptively and inequitably" collected the Excise Tax in a "wholly improper attempt to obtain reimbursement for amounts that Respondent has and had no right to pass on to its customers," and that as a result of Respondent's conduct, "Claimant and the Class are and have been wrongfully subjected to the Excise Tax."

In the Arbitration Demand, Claimant and the putative Class seek an injunction, as well as compensatory damages, restitution and/or other relief to redress Respondent's "unlawful, deceptive and inequitable conduct," which is claimed to violate New York Tax Law Sec. 186-e, New York General Business Law Sec. 349, and to constitute unjust enrichment. In an Amended Demand, submitted on June 2, 2006, Claimant added a claim for violation of the Kansas Consumer Protection Act, Kan. Stat. 50-623 *et seq*.

Pursuant to Sprint's Terms and Conditions of Service ("Agreement"), under the heading "MANDATORY ARBITRATION OF DISPUTES," Claimant is required to arbitrate "ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES * * * ARISING OUT OF OR RELATING TO" Sprint's Services. (Capital lettering in original.)

2

Under the heading "MANDATORY ARBITRATION OF DISPUTES," the

Agreement also provides that:

> "YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT
> NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER
> PERSON OR ENTITY IN A LAWSUIT, ARBITRATION OR OTHER
> PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS
> AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS;
> AND THAT NEITHER SPRINT NOR YOU WILL ASSERT A CLAIM IN A
> REPRESENTATIVE CAPACTIY ON BEHALF OF ANYONE ELSE. IF FOR
> ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A
> CLAIM, WE AGREE TO WAIVE TRIAL BY JURY."

(Capital lettering in original.)

In a subsequent paragraph, headed "Miscellaneous," the Agreement provides that

it "is governed by and must be construed under federal law and the laws of the State of

Kansas, without regard to choice of law principles." The Agreement provides that an

arbitration may be filed with either JAMS or the National Arbitration Forum, and that

"the arbitration will be conducted by and under the then-applicable rules of JAMS or

NAF."

None of the JAMS arbitration rules in effect at the time this arbitration was filed

addressed the issue of class action preclusion. However, at the time the Demand was

filed, JAMS had adopted and announced a "Policy Regarding Use of Class Action

Preclusion Clauses in Consumer Cases," ("Class Action Preclusion Policy") which

provided, in relevant part, that "[i]f a class action arbitration is filed at JAMS and there is

a class action preclusion clause, JAMS will accept the case and not enforce the clause."

In an "Addendum: Implementation of JAMS Class Action Arbitration Preclusion Policy

in Consumer Cases," JAMS stated that where a consumer arbitration contains a class

action arbitration preclusion clause:

"At some point in this process, one of the parties may go to court to either enforce the preclusion clause or to have it declared unenforceable. This could happen either before or after the arbitration has been filed at JAMS.

> 1) If the court declares the preclusion clause to be valid and sends it back to JAMS as an individual case, JAMS will proceed on that basis and appoint an arbitrator.*

> 2) If the court declares the preclusion to be invalid, then JAMS will proceed with the arbitration as a class action arbitration.

> 3) Obviously if neither party goes to court, JAMS will proceed with the administration of the arbitration as a class arbitration.

> *Note that under *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003), the Claimant is free to argue the invalidity of the preclusion clause to the arbitrator and, under *Bazzle*, the arbitrator has the authority to determine whether the arbitration can proceed as a class action. Neither JAMS nor any other ADR Administrator has the authority to dictate a result to the arbitrator."

See Claimant's February 1, 2006 Letter Brief, Exhibit C (November 12, 2004 Press

Release and Class Action Policy).

The parties to this arbitration were initially informed that the Class Action

Preclusion Policy would apply to this matter. Sprint objected to JAMS administering the

matter as a class action, and both sides submitted briefs to the JAMS National Arbitration

Committee ("NAC"). While this issue was pending before the NAC, JAMS withdrew the

Class Action Preclusion Policy, and promulgated "JAMS Class Action Procedures"

(dated February 2005) with respect to purported class arbitrations. In a press release

dated March 10, 2005, JAMS noted that "court decisions on the validity of class action

preclusion clauses have varied by jurisdiction," and that JAMS and its arbitrators would

"apply the law on a case by case basis in each jurisdiction." JAMS looks to the law in the

jurisdiction in which the case is filed, or the law as agreed upon by the parties. In

general, if there is no clear law within the jurisdiction regarding the validity of a class

action preclusion clause, JAMS will follow the terms of the clause, without prejudice to claimant's right to raise the issue with the appointed arbitrator or with a court of competent jurisdiction.

Rule 2 of the JAMS Class Action Procedures provides that "the Arbitrator shall determine as a threshold matter whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class," and that "the Arbitrator may set forth his or her determination in a partial final award subject to immediate court review." Although not explicitly stated in Rule 2, it is the position of JAMS that the inquiry contemplated by Rule 2 includes the question of whether an express class action preclusion provision is enforceable.

By letter dated March 17, 2005, the parties were informed that JAMS would follow the JAMS Class Action Procedures in this matter, that JAMS was "not aware of any clear law in this jurisdiction" on this issue, and that JAMS would therefore administer the arbitration only as an individual matter, but that "[i]f claimant believes that the relevant law of the jurisdiction compels a different result, the claimant may either raise that issue with the arbitrator or with a court of competent jurisdiction." The parties were also advised that this Arbitrator had been appointed to adjudicate the claims asserted in the Demand.

The arbitration was thereafter administratively dormant until January 2006, when Claimant requested that the issue of the enforceability of the class action preclusion provision be determined by the Arbitrator. Thereafter, the parties briefed issues relating to JAMS' jurisdiction and the enforceability of the class action preclusion provision, and, on June 2, 2006, Claimant submitted his First Amended Demand for Class Action

Arbitration, which added a claim under the Kansas Consumer Protection Act. Sprint did not oppose the amendment, but reserved all of its rights and defenses regarding the amended claims asserted by Claimant.

## DISCUSSION

The central issue before this Arbitrator is whether the class action preclusion provision of the Agreement is valid and enforceable under applicable law.[1]  Before turning to that issue, however, several preliminary issues must be addressed.

### Preliminary Issues

Claimant first argues that this arbitration should proceed as a class action because the Demand was filed when the short-lived Class Action Policy was in effect. Claimant's argument is based upon the provision of the Arbitration Agreement that "an arbitration may be filed with either JAMS or the National Arbitration Forum," and that "the arbitration will be conducted by and under the then-applicable rules of JAMS or NAF." It is Claimant's position that the Class Action Policy constitutes a then-applicable JAMS rule. Accordingly, Claimant contends that this arbitration should be administered as a class action unless and until Respondent obtains a court order declaring the class action preclusion clause enforceable. This argument has been considered and rejected by JAMS. It is the position of JAMS that the withdrawn Class Action Preclusion Policy was

---

[1] The Arbitrator has jurisdiction to determine the enforceability of the class action preclusion clause pursuant to the Arbitration Agreement and JAMS arbitration rules. The instant "controversy or dispute" regarding the enforceability of the class action preclusion clause is one "arising out of or relating to" the Arbitration Agreement. In addition, the JAMS rules incorporated into the Arbitration Agreement provide that "[j]urisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation or scope of the agreement under which Arbitration is sought * * * shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Comprehensive Rule 11(c); see also JAMS Streamlined Rule 8(c). See *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (incorporation of rules of arbitration forum governing arbitrability and jurisdiction "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator").

at no time a JAMS "rule," or incorporated by reference into any of JAMS arbitration rules. I note that the Class Action Preclusion Policy does not use the term "rule"; nor is the Class Action Preclusion Policy referenced in any JAMS arbitration rules. *Cf.* JAMS Class Action Procedures (referring to specific provisions as "rules," and expressly stating that the Class Action Procedures supplement JAMS arbitration rules).

Claimant next argues that the class action preclusion provision of the Arbitration Agreement is unenforceable because it conflicts with JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness ("Minimum Standards"). Under this policy, JAMS declines to accept for administration any arbitration agreement that does not comply with the Minimum Standards. Minimum Standard 3 requires that "[r]emedies that would otherwise be available to the consumer under applicable federal, state or local laws must remain available under the arbitration clause, unless the consumer retains the right to pursue the unavailable remedies in court." Claimant argues that the ability to pursue a class action is a "remedy" that would otherwise be available to him under federal and state law. This issue has already been considered and rejected by JAMS. In any event, even if Claimant were correct, the result would be that JAMS would refuse to administer the arbitration, not that JAMS would be required to administer the arbitration as a class action.

## Enforceability of Class Action Preclusion

Claimant asserts that the class action preclusion provision of the Agreement is unenforceable under the law of Kansas because it conflicts with specific provisions of the Kansas Consumer Protection Statute. Although not expressly pleaded, Claimant also asserts that the class action preclusion provision is unconscionable under the common law of contract as applied by the courts of Kansas.

### Kansas Consumer Protection Act

Kansas has enacted a comprehensive Unfair Trade and Consumer Protection Act, Kansas Statutes, Chapter 50, Article 6 (the "KCPA"). The KCPA is designed, *inter alia,* to "simplify, clarify and modernize the law governing consumer transactions," and to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. 50-623. The KCPA prohibits a "supplier" from engaging in any deceptive act or practice, or any unconscionable act or practice in connection with a "consumer transaction." A "consumer transaction" is defined as "a sale, lease, assignment or other disposition for value of property or services within this state * * * to a consumer." Kan. Stat. 50-624(c). Deceptive acts and practices are defined in Kan. Stat. 50-626; unconscionable acts and practices are defined in Kan. Stat. 50-627.

Kan. Stat 50-634 sets forth the "private remedies" available to consumers under the KCPA. "A consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice," Kan. Stat. 50-634(2)(d). "Whether a consumer seeks or is entitled to recover damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief" against an act or practice that violates the KCPA, Kan. Stat.

50-634(2)(d). The KCPA further provides that "[e]xcept as otherwise provided in this

act, a consumer may not waive or agree to forego rights or benefits under this act." Kan.

Stat. 50-625. There is no exception to this provision in the KCPA that pertains to waiver

of the right to bring a class action.

Based upon the clear provisions of the KCPA, I find that the class action

preclusion provision in the Arbitration Agreement is unenforceable because it violates the

anti-waiver provisions of Kan. Stat. 50-625.

Relying on a decision by another JAMS arbitrator, Sprint argues that "[t]he

opportunity given a consumer to pursue a class action under the KCPA is procedural and

subject to waiver."[2] Arbitration between Donald Rodkin and Sprint PCS Group, JAMS

Arbitration No. 134005293, Interim Order of February 6, 2006. I respectfully disagree.

Neither the *Rodkin* arbitrator nor Sprint cites any authority for this interpretation of the

KCPA anti-waiver provision.[3] Notably, the provision itself makes no distinction between

---

[2] Sprint has also argued in this case and in *Rodkin* that the KCPA does not apply to
Sprint's contract with Claimant because the services provided to Claimant do not
constitute a "sale lease, assignment or other disposition for value of property or services
within this state * * * to a consumer." Kan. Stat. 624(c) (defining "consumer
transaction"). I agree with the *Rodkin* arbitrator that this argument is meritless. Sprint's
operations are headquartered in Kansas, from which it unquestionably provides services
to its customers throughout the United States. Moreover, it would be manifestly unfair
for Sprint to require its customers to agree to the application of Kansas law, and at the
same time deny application of its consumer protection statute. Having chosen to impose
Kansas law upon its customers, Sprint cannot be permitted to make a self-serving
determination of *which* laws of Kansas will apply to disputes under the Arbitration
Agreement.

[3] *Billings v. Clinitec Int'l, Inc.*, No. 00-1236-JTM, 2000 U.S. Dist. LEXIS 10904 (D.
Kan. July 25, 2000), cited by Sprint in the *Rodkin* case, does not address waiver of the
provisions of Kan. Stat. 50-634, and accordingly provides little if any support for the
*Rodkin* arbitrator's decision on this point. Notably, the court held in that case that the
plaintiff "did not waive or agree to forego any rights or benefits" by agreeing to litigate
disputes arising out of or related to the Agreement in a Pennsylvania state court, because
he could bring his KCPA claims in that court. The court made no distinction between

"substantive" and "procedural" rights or benefits. I therefore find that the class action

preclusion provision is unenforceable with respect to Claimant's claims under the KCPA.

Unconscionability

Federal and state courts are divided regarding the enforceability of class action

preclusion provisions in consumer contracts, and application of the law of

unconscionability to such provisions.[4] No state court in Kansas has ruled on this issue.

---

"substantive" and "procedural" rights under the KCPA. *Cf. Am. Online v. Superior Court*, 90 Cal. App. 4th 1, (2001), *rev. denied*, 2001 Cal. LEXIS 7051 (refusing to enforce contractual forum selection clause because, *inter alia*, enforcement would effectively waive the right to bring a class action under the California consumer protection statute, which provides that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void")

[4] A number of federal and state courts have found arbitration agreements containing class action preclusion clauses "substantively" unconscionable under state law, primarily on the ground that the preclusion of class actions in certain cases is contrary to public policy. *Kristian v. Comcast*, 446 F.3d 25, 53 (1st Cir. 2006); *Al-Safin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1260-61 (9th Cir. 2005); *Ting v. AT&T Corp.*, 319 F.3d 1126, 1150 (9th Cir. 2003); *Luna v. Household Fin. Corp.*, 236 F.Supp.2d 1166, 1179 (W.D. Wash. 2002); *Lozada v. Dale Baker Oldsmobile*, 91 F.Supp.2d 1087, 1105 (W.D. Mich. 2000); *Muhammad v. County Bank of Rehoboth Beach*, 2006 N.J. LEXIS 1154 (New Jersey Supreme Court); *Discover Bank v. Superior Court*, 36 Cal.4th 148, 161 (2005); *Whitney v. Alltell Communications, Inc.*, 173 S.W.3d 300, 311-314 (Mo. Ct. App. W.D. 2005); *Kinkel v. Cingular Wireless, LLC*, 357 Ill. App.3d 556, 564 (Ill. App. 5th Dist. 2005); *Leonard v. Terminix Int'l*, 854 So.2d 529, 538 (Ala. 2002); *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 283 (W. Va. 2002); *Bellsouth Mobility LLC v. Christopher*, 819 So.2d 171, 173 (Fla. App. 2002); *Powertel, Inc. v. Bexley*, 743 So.2d 570, 576 (Fla. App. 1999), *rev. denied*, 763 So.2d 1044 (2000).
Other courts have found class action preclusion clauses not unconscionable. *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (STATE law?); *Spann v. American Express Travel*, 2006 Tenn. App. LEXIS 582 (2006); *Ranieri v. Bell Atlantic Mobile*, 304 A.D.2d 353, 354 (1st Dep't), *appeal denied*, 1 N.Y.3d 502 (2003); *Rains v. Foundation Health Sys.*, 23 P.3d 1249, 1253 (Colo. App. 2001); *Edelist v. MBNA America Bank*, 790 A.2d 1249, 1261 (Del. Super. 2001,

The leading Kansas case on the subject of unconscionability is *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755 (1976).

In *Wille*, the Court observed that "American courts have traditionally taken the view that competent parties may make contracts on their own terms, provided they are neither illegal nor contrary to public policy, and that in the absence of fraud, mistake, or duress a party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to him [citation omitted]. Gradually, however, this principle of freedom of contract has been qualified by the courts as they were confronted by contracts so one-sided that no fair minded person would view them as just or tolerable." *Wille*, 219 Kan. at 757.[5]

The court held that

"Although the doctrine of unconscionability is difficult to define precisely[,] courts have identified a number of factors or elements as aids for determining its applicability to a given set of facts. These factors include: (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which

---

[5] The *Wille* court also endorsed the general principle set forth by Williston that "'[p]eople should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.'" *Wille*, 219 Kan. at 762 (quoting 14 Williston on Contracts, 3d Ed., § 1632).

are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power."

*Wille* at 758-59 (citations omitted).

The *Wille* court further held that "mere disparity of bargaining strength, without more, is not enough to make out a case of unconscionability" and that in addition to unequal bargaining power, there must be "some element of deception or substantive unfairness." *Wille* at 759 (*quoting* Ellinghaus, *In Defense of Unconscionability*, 78 YLJ 757, 766-67). The court concluded that "[t]he cases seem to support the view that there must be additional factors such as deceptive bargaining conduct as well as unequal bargaining power to render the contract between the parties unconscionable. In summary, the doctrine of unconscionability is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain." *Wille*, 219 Kan. at 755-60 (citation omitted).[6]

---

[6] Although *Wille* was decided under Kansas common law, the court relied extensively on the provisions of the Uniform Commercial Code (UCC) relating to unconscionability, Kan. Stat. 84-2-302, and on cases and articles pertaining to unconscionability under the UCC. *Wille*, 219 Kan. at 757-59. The *Wille* court quoted the following exerpt from the comment to the Kansas UCC: "The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract * * *. The principle is one of the prevention of oppression and unfair surprise * * * and not of disturbance of risks because of superior bargaining power * * *." *Id.* at 758. The court also observed that the UCC is designed to deal with "two types of situations": "unfair surprise," where there has actually been no assent to the "fine print terms" of the contract,

Relying on *Wille*, the Kansas Supreme Court has repeatedly held that there must be some element of deceptive bargaining conduct or practice as well as unequal bargaining power to render the contract between the parties unconscionable. *E.g.*, *Stovall v. Confimed.com, LLC*, 272 Kan. 1313 (2002); *Aves v. Shah*, 258 Kan. 506 (1995); *Hawes v. Kansas Farm Bureau*, 238 Kan. 404, 406 (1985); *Willman v. Ewen*, 230 Kan. 262, 266 (1981) (all cases involving allegations of unconscionability under the KCPA). The Kansas Supreme Court has also held that there is no claim of unconscionable conduct where a record is "devoid of any evidence of any deceptive or oppressive practices, overreaching, intentional misstatements, or concealment of facts." *See, e.g.*, *Stovall v. Confimed.com*, 272 Kan. at 1323; *Gonzales v. Associates Financial Serv. Co. of Kansas*, 266 Kan. 141, 166-67 (1998) (both KCPA cases).

With respect to the factors to be considered in addition to unequal bargaining power, the Kansas courts have frequently focused on whether the challenged contract terms were concealed or unclear. *See, e.g.*, *Wille*, 219 Kan. at 763-64; *Frets v. Capitol Federal Savings & Loan Association*, 238 Kan. 614, 622 (1986) *see also John Deere Leasing Company v. Blubaugh*, 636 F. Supp. 1569, 1574 (D. Kan. 1986). The Kansas Supreme Court has also considered the extent to which a consumer had other sources for the product in question. *See, e.g.*, *Frets*, 238 Kan. at 623 (1986); *see also*, *Wight v. Agristor Leasing*, 652 F. Supp. 1000, 1012-13 (D. Kan. 1987).

---

and "oppression," where, although there has been actual assent, the agreement, surrounding facts, and relative bargaining of the parties result in vulnerability to a "grossly unequal bargain." *Id.* (*quoting* Note, "*The Doctrine of Unconscionability*," 19 Maine L.Rev. 81, 85, and *citing* Spanogle, "*Analyzing Unconscionability Problems*," 117 U.Pa.L.Rev. 931).

Applying these principles, a Kansas federal court recently rejected a claim of unconscionability with respect to an arbitration agreement contained in another Sprint contract.[7] *In re Universal Service Fund Telephone Billing Practices Litigation*, 300 F. Supp. 2d 1107, 1125-1126 (D. Kan. 2003). In that case it was "undisputed that Sprint was of superior bargaining strength and presented its terms and conditions of service, including the arbitration clause, to its customers as a form contract on a take-it-or-leave-it basis." The court found, however, that Sprint's arbitration clause was enforceable because "there was no element of deception." *Id.*, at 1125. The court noted that "[t]he arbitration clause is written in relatively plain language, not confusing terms, and emphasizes important aspects in bold all-capital lettering," and that "there is no evidence in the record that plaintiffs could not have readily purchased this same fungible product from another long distance carrier, who, unlike Sprint * * *, did not require its customers to arbitrate disputes. *Id.*, at 1126.

In this case, Claimant has not alleged or submitted evidence of deceptive bargaining conduct. Nor, apart from assertions of unequal bargaining power and a contract of adhesion, has Claimant alleged or provided evidence of any of the other factors that Kansas courts have considered significant in evaluating a claim of unconscionability, such as unclear or hidden terms. Moreover, Claimant acknowledges that at the time he entered into the agreement with Sprint, other wireless providers did not prohibit class actions.

---

[7] The Sprint arbitration agreement in *Universal Service Fund* did not preclude class actions; the claim of unconscionability was addressed to the mandatory arbitration provision of the agreement .

14

Significantly, Claimant has not cited, nor has my research uncovered any case decided under Kansas law that found a contract unconscionable based solely on the ground that a contract term was unfair or contrary to public policy, in the absence of deceptive bargaining conduct or other factors, such as concealment of the term in question.[8] Under these circumstances, I find that Claimant has not established that the class action preclusion provision of the Sprint contract is unconscionable under Kansas law.

## CONCLUSION

This arbitration is governed by the JAMS Class Action Procedures and not by the withdrawn Class Action Preclusion Policy. The class action preclusion provision in the Sprint agreement at issue is unenforceable with respect to Claimant's claims under the KCPA. Claimant has not established that the class action preclusion provision is unconscionable under Kansas law.

---

[8] Although I have not conducted an exhaustive search, I have found only one case decided under Kansas law in which a contract has been found unconscionable: *John Deere Leasing Company v. Blubaugh*, 636 F. Supp. 1569 (D. Kan. 1986). In that case, the court found a provision in a lease relating to the lessor's remedy on default to be unconscionable where not only was the remedy "unduly harsh and one-sided," but the term itself was "buried" and "indecipherable."

Counsel are requested to contact Elizabeth Ryan at 212-607-2711 to schedule a telephone conference regarding the next steps to be taken in the arbitration, including whether Respondent wishes to have the Arbitrator set forth the above determination in a partial final award subject to immediate court review.

SO ORDERED.

_Kathleen A. Roberts_

KATHLEEN A. ROBERTS
ARBITRATOR

DATED: October 25, 2006

16

## *PROOF OF SERVICE BY FACSIMILE*

I, Elizabeth Ryan, not a party to the within action, hereby declare that on October 25, 2006, I served the attached Decision on Enforceability of Class Action Preclusion Clause on the parties in the within action by faxing true copies thereof, at New York, NEW YORK, addressed as follows:

William R. Weinstein
Wechsler Harwood LLP
488 Madison Avenue
8th Floor
New York, NY 10022
Tel: 212-935-7400
Fax: 212-753-3630

Mark Hinderks Esq.
Stinson Morrison Hecker LLP
12 Corporate Woods
10975 Benson, Suite 550
Overland Park, KS 66210
Tel: 913-451-8600
Fax: 913-451-6352

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on October 25, 2006.

Elizabeth Ryan
Elizabeth Ryan

# Exhibit C

JAMS NEW YORK

-----------------------------------------------------X

Vincent Emilio,

                Claimant,

        -v-                       DECISION ON
                                       MOTION FOR RECONSIDERATION

Sprint Spectrum L.P.,                OF OCTOBER 25, 2006 CLASS ACTION
                                       PRECLUSION CLAUSE DECISION

                Respondent.

-----------------------------------------------------X

        Presently before me is a motion by Respondent Sprint Spectrum L.P. ("Sprint"),

pursuant to Rule 2 of the 2005 JAMS Class Action Procedures, for reconsideration of and

to vacate my October 25, 2006 decision ("Decision") on the enforceability of the class

action preclusion clause contained in Sprint's customer service agreement applicable to

this dispute, based on the Supreme Court's recent decision in *Stolt-Nielsen S.A. v.*

*AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758 (2010). My Decision held that the arbitration

clause at issue permitted the arbitration to proceed on behalf of a class, based on a finding

that "the class action preclusion provision in the Arbitration Agreement is unenforceable

because it violates the anti-waiver provisions of Kan. Stat. 50-625."

BACKGROUND

        The Arbitration Demand in this case was filed with JAMS on January 4, 2005, by

Claimant Vincent Emilio ("Emilio" or "Claimant"), "individually and on behalf of all

others similarly situated," against Respondent Sprint Spectrum L.P. d/b/a Sprint PCS

("Sprint" or "Respondent"). Claimant is a resident of Mt Vernon, New York. Sprint is

alleged to be a "global telecommunications company, structured as a Delaware limited

partnership with its principal offices located in Kansas. Sprint is alleged to be wholly

1

owned by Sprint Corporation, a Kansas corporation with its principal executive offices located in Kansas.

The Arbitration Demand asserts that Respondent charges and collects New York State Excise Tax ("Excise Tax") from wireless telephone customers, even though the obligation to pay Excise Tax under New York law is imposed solely and directly on Respondent, *i.e.*, Respondent is not authorized under New York law to pass this tax obligation on to consumers.

The Arbitration Demand asserts that Claimant brings this class action individually and on behalf of a class comprised of "all persons who, during the period commencing six years prior to the filing of this arbitration demand and continuing to the present (the "Class Period"), were Sprint wireless telephone service customers who paid "New York State Excise Tax" ("Excise Tax(es)") as part of their monthly charges (the "Class")".

The Arbitration Demand asserts that Respondent has "unlawfully, deceptively and inequitably" collected the Excise Tax in a "wholly improper attempt to obtain reimbursement for amounts that Respondent has and had no right to pass on to its customers," and that as a result of Respondent's conduct, "Claimant and the Class are and have been wrongfully subjected to the Excise Tax."

In the Arbitration Demand, Claimant and the putative Class seek an injunction, as well as compensatory damages, restitution and/or other relief to redress Respondent's "unlawful, deceptive and inequitable conduct," which is claimed to violate New York Tax Law Sec. 186-e, New York General Business Law Sec. 349, and to constitute unjust enrichment. In an Amended Demand, submitted on June 2, 2006, Claimant added a claim for violation of the Kansas Consumer Protection Act, Kan. Stat. 50-623 *et seq.*

2

Sprint did not oppose the amendment, but reserved all of its rights and defenses regarding the amended claims asserted by Claimant.

Pursuant to Sprint's Terms and Conditions of Service ("Agreement"), under the heading "MANDATORY ARBITRATION OF DISPUTES," Claimant is required to arbitrate "ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES * * * ARISING OUT OF OR RELATING TO" Sprint's Services.  (Capital lettering in original.)

Under the heading "MANDATORY ARBITRATION OF DISPUTES," the Agreement also provides that:

> "YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER PERSON OR ENTITY IN A LAWSUIT, ARBITRATION OR OTHER PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS; AND THAT NEITHER SPRINT NOR YOU WILL ASSERT A CLAIM IN A REPRESENTATIVE CAPACTIY ON BEHALF OF ANYONE ELSE.  IF FOR ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A CLAIM, WE AGREE TO WAIVE TRIAL BY JURY."

(Capital lettering in original.)

In a subsequent paragraph, headed "Miscellaneous," the Agreement provides that it "is governed by and must be construed under federal law and the laws of the State of Kansas, without regard to choice of law principles."

Kansas has enacted a comprehensive Unfair Trade and Consumer Protection Act, Kansas Statutes, Chapter 50, Article 6 (the "KCPA").  The KCPA is designed, *inter alia*, to "simplify, clarify and modernize the law governing consumer transactions," and to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. 50-623.  The KCPA prohibits a "supplier" from engaging in any deceptive act

3

or practice, or any unconscionable act or practice in connection with a "consumer transaction." A "consumer transaction" is defined as "a sale, lease, assignment or other disposition for value of property or services within this state * * * to a consumer." Kan. Stat. 50-624(c). Deceptive acts and practices are defined in Kan. Stat. 50-626; unconscionable acts and practices are defined in Kan. Stat. 50-627.

Kan. Stat 50-634 sets forth the "private remedies" available to consumers under the KCPA. "A consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice," Kan. Stat. 50-634(2)(d). "Whether a consumer seeks or is entitled to recover damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief" against an act or practice that violates the KCPA, Kan. Stat. 50-634(2)(d). The KCPA further provides that "[e]xcept as otherwise provided in this act, a consumer may not waive or agree to forego rights or benefits under this act." Kan. Stat. 50-625. There is no exception to this provision in the KCPA that pertains to waiver of the right to bring a class action.

As noted above, my Decision held that the class action preclusion provision in the Sprint Arbitration Agreement is unenforceable because it violates the anti-waiver provisions of Kan. Stat. 50-625.[1] Sprint did not appeal the Decision.

## DISCUSSION

The *Stolt-Nielsen* Court addressed the specific question of "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent

---

[1] I rejected Emilio's contention that the class action preclusion provision was unconscionable under Kansas law.

4

with the [FAA]." 130 S.Ct. at 1764. The Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1776 (emphasis in original). The Court held that "class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed [that] the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* at 1775.

Sprint argues that based upon *Stolt-Nielsen*, class arbitration proceedings cannot be compelled where, as here, the parties expressly agreed that they would *not* arbitrate on a class-wide basis, and rather agreed to arbitrate with each other on a purely bilateral basis. Moreover, Sprint asserts that "*Stolt-Nielsen* makes clear that the FAA preempts any interpretation of the KCPA that would render the arbitration agreement unenforceable or require class arbitration."

*Stolt-Nielsen*, however, says nothing about preemption or the unenforceability of class preclusion provisions based upon state law. Sprint cites no case that has adopted this reading of *Stolt-Nielsen*. Indeed, those courts that have addressed the relationship between *Stolt-Nielsen* and the preemption of state law have rejected this argument. *See, e.g., Fensterstock v. Education Partners*, 611 F.3d 124, 133 (2d Cir. 2010); *Litman v. Cellco P'shp*, 2010 WL 2017665, at *4 n.5 (3d Cir. May 21, 2010); *Puleo v. ChaseBank USA, N.A.*, 605 F.3d 172, 182 n.5, 194 (3d Cir. 2010); *McArdle v. AT&T Mobility LLC*, 2010 WL 1875812, at *1, *2 (N.D. Cal. May 10, 2010); *Mathias v. Rent-A-Center, Inc.*, 2010 WL 3715059, at *5 (E.D. Cal. Sept. 15, 2010).[2]

---

[2] Sprint points out that following the issuance of the Stolt-Nielsen decision, at least one court and several arbitrators have reconsidered and vacated and/or reversed

Sprint has cited only one case that addresses the effect of *Stolt-Nielsen* where the court has found a class preclusion provision unenforceable. In *Fensterstock v. Education Partners*, the plaintiff filed a putative class action in the Southern District of New York. The defendant moved to compel arbitration, based upon an arbitration clause that included a class action preclusion provision. The court held that the class action preclusion provision was unconscionable under California law and denied the motion to compel. On appeal, the Second Circuit affirmed the determination that the provision was unconscionable and unenforceable. Based upon a severability provision, the defendant requested that the class preclusion provision be excised and that the case be referred to [class] arbitration. The court declined, and held, based upon *Stolt-Nielsen*:

> In the present case, the Note's arbitration clause is not silent, but expressly states that "the arbitration of Claims *must proceed on an individual (non-class, non-representative) basis*." (Note, Terms and Conditions Statement at 4 (emphasis added).) Thus, the parties plainly did not agree that arbitration may be conducted on a class-wide basis, and we do not see that an order for class-wide arbitration can be premised on the Note's severability provision: Our conclusion that a given agreement is invalid and unenforceable does not mean that the parties in fact reached the opposite agreement. Thus, excising the Note's class action and class arbitration waiver clause leaves the Note silent as to the permissibility of class-based arbitration, and under *Stolt-Nielsen* we have no authority to order class-based arbitration.

Plaintiff was therefore permitted to pursue his claims in court as a class action.

Relying on *Fensterstock*, Sprint argues that Sprint cannot be compelled to arbitrate on a class-wide basis, and that "[e]ven if the Arbitrator were to give the class action waiver no effect, what would remain is an arbitration agreement that is silent as to the issue of class arbitration (as was the case in *Stolt-Nielsen*), and the Arbitrator would

---

clause construction awards. I note, however, that none of these cases involved a class preclusion provision found to be unenforceable under state law.

still be compelled to direct the parties to proceed with a bilateral arbitration." This proposal, however, would give Sprint the benefit of a class preclusion provision that has been found unenforceable *and* the benefit of an arbitral forum. In essence, Sprint proposes that the Arbitration Agreement be enforced as written, notwithstanding the finding of unenforceability. Neither *Stolt-Nielsen* nor *Fensterstock* supports such a result.

Had this issue arisen in the posture of the *Fensterstock* case, Sprint would be required to defend a putative class action in court (or, *if plaintiff and Sprint agreed*, could proceed with a class-wide arbitration). I therefore find that Sprint cannot be compelled to proceed with a class-wide arbitration, but also that plaintiff cannot be compelled to proceed with a bilateral arbitration, and must be given the opportunity to pursue his class claims in a court action.

In light of the procedural posture of this case, I would like to consider the views of counsel regarding how best to effectuate this decision. Counsel are requested to contact my case manager, Melanie O'Harra, at 212-607-2707, or moharra@jamsadr.com to schedule a telephone conference.

SO ORDERED.

Kathleen A. Roberts

KATHLEEN A. ROBERTS
ARBITRATOR

DATED: December 27, 2010

# Exhibit D

JAMS NEW YORK

-----------------------------------------------------X

Vincent Emilio,

               Claimant,

     -v-

Sprint Spectrum L.P.,                     PARTIAL FINAL AWARD

               Respondent.

-----------------------------------------------------X

At the request of the parties, this Partial Final Award sets forth my ruling on a

motion by Respondent Sprint Spectrum L.P. ("Sprint"), pursuant to Rule 2 of the 2005

JAMS Class Action Procedures, for reconsideration of and to vacate my October 25,

2006 decision ("Decision") on the enforceability of the class action preclusion clause

contained in Sprint's customer service agreement applicable to this dispute, based on the

Supreme Court's recent decision in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130

S.Ct. 1758 (2010). My Decision held that the arbitration clause at issue permitted the

arbitration to proceed on behalf of a class, based on a finding that "the class action

preclusion provision in the Arbitration Agreement is unenforceable because it violates the

anti-waiver provisions of Kan. Stat. 50-625."

## BACKGROUND

The Arbitration Demand in this case was filed with JAMS on January 4, 2005, by

Claimant Vincent Emilio ("Emilio" or "Claimant"), "individually and on behalf of all

others similarly situated," against Respondent Sprint Spectrum L.P. d/b/a Sprint PCS

("Sprint" or "Respondent"). Claimant is a resident of Mt Vernon, New York. Sprint is

alleged to be a "global telecommunications company, structured as a Delaware limited

1

partnership with its principal offices located in Kansas. Sprint is alleged to be wholly owned by Sprint Corporation, a Kansas corporation with its principal executive offices located in Kansas.

The Arbitration Demand asserts that Respondent charges and collects New York State Excise Tax ("Excise Tax") from wireless telephone customers, even though the obligation to pay Excise Tax under New York law is imposed solely and directly on Respondent, *i.e.*, Respondent is not authorized under New York law to pass this tax obligation on to consumers.

The Arbitration Demand asserts that Claimant brings this class action individually and on behalf of a class comprised of "all persons who, during the period commencing six years prior to the filing of this arbitration demand and continuing to the present (the "Class Period"), were Sprint wireless telephone service customers who paid "New York State Excise Tax" ("Excise Tax(es)") as part of their monthly charges (the "Class")".

The Arbitration Demand asserts that Respondent has "unlawfully, deceptively and inequitably" collected the Excise Tax in a "wholly improper attempt to obtain reimbursement for amounts that Respondent has and had no right to pass on to its customers," and that as a result of Respondent's conduct, "Claimant and the Class are and have been wrongfully subjected to the Excise Tax."

In the Arbitration Demand, Claimant and the putative Class seek an injunction, as well as compensatory damages, restitution and/or other relief to redress Respondent's "unlawful, deceptive and inequitable conduct," which is claimed to violate New York Tax Law Sec. 186-e, New York General Business Law Sec. 349, and to constitute unjust enrichment. In an Amended Demand, submitted on June 2, 2006, Claimant added a

2

claim for violation of the Kansas Consumer Protection Act, Kan. Stat. 50-623 *et seq.*

Sprint did not oppose the amendment, but reserved all of its rights and defenses regarding

the amended claims asserted by Claimant.

Pursuant to Sprint's Terms and Conditions of Service ("Agreement"), under the

heading "MANDATORY ARBITRATION OF DISPUTES," Claimant is required to

arbitrate "ANY AND ALL CLAIMS, CONTROVERSIES OR DISPUTES * * *

ARISING OUT OF OR RELATING TO" Sprint's Services. (Capital lettering in

original.)

Under the heading "MANDATORY ARBITRATION OF DISPUTES," the

Agreement also provides that:

> "YOU AND SPRINT FURTHER AGREE THAT NEITHER SPRINT
> NOR YOU WILL JOIN ANY CLAIM WITH THE CLAIM OF ANY OTHER
> PERSON OR ENTITY IN A LAWSUIT, ARBITRATION OR OTHER
> PROCEEDING; THAT NO CLAIM EITHER SPRINT OR YOU HAS
> AGAINST THE OTHER SHALL BE RESOLVED ON A CLASS-WIDE BASIS;
> AND THAT NEITHER SPRINT NOR YOU WILL ASSERT A CLAIM IN A
> REPRESENTATIVE CAPACTIY ON BEHALF OF ANYONE ELSE.  IF FOR
> ANY REASON THIS ARBITRATION PROVISION DOES NOT APPLY TO A
> CLAIM, WE AGREE TO WAIVE TRIAL BY JURY."

(Capital lettering in original.)

In a subsequent paragraph, headed "Miscellaneous," the Agreement provides that

it "is governed by and must be construed under federal law and the laws of the State of

Kansas, without regard to choice of law principles."

Kansas has enacted a comprehensive Unfair Trade and Consumer Protection Act,

Kansas Statutes, Chapter 50, Article 6 (the "KCPA").  The KCPA is designed, *inter alia*,

to "simplify, clarify and modernize the law governing consumer transactions," and to

"protect consumers from suppliers who commit deceptive and unconscionable practices."

3

Kan. Stat. 50-623. The KCPA prohibits a "supplier" from engaging in any deceptive act or practice, or any unconscionable act or practice in connection with a "consumer transaction." A "consumer transaction" is defined as "a sale, lease, assignment or other disposition for value of property or services within this state * * * to a consumer." Kan. Stat. 50-624(c). Deceptive acts and practices are defined in Kan. Stat. 50-626; unconscionable acts and practices are defined in Kan. Stat. 50-627.

Kan. Stat 50-634 sets forth the "private remedies" available to consumers under the KCPA. "A consumer who suffers loss as a result of a violation of this act may bring a class action for the damages caused by an act or practice," Kan. Stat. 50-634(2)(d). "Whether a consumer seeks or is entitled to recover damages or has an adequate remedy at law, a consumer may bring a class action for declaratory judgment, an injunction and appropriate ancillary relief" against an act or practice that violates the KCPA, Kan. Stat. 50-634(2)(d). The KCPA further provides that "[e]xcept as otherwise provided in this act, a consumer may not waive or agree to forego rights or benefits under this act." Kan. Stat. 50-625. There is no exception to this provision in the KCPA that pertains to waiver of the right to bring a class action.

As noted above, my Decision held that the class action preclusion provision in the Sprint Arbitration Agreement is unenforceable because it violates the anti-waiver provisions of Kan. Stat. 50-625.[1] Although the Decision was set forth in a partial Final Award, Sprint did not seek judicial review.

---

[1] I rejected Emilio's contention that the class action preclusion provision was unconscionable under Kansas law.

4

## DISCUSSION

The *Stolt-Nielsen* Court addressed the specific question of "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the [FAA]." 130 S.Ct. at 1764. The Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1776 (emphasis in original). The Court held that "class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed [that] the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.* at 1775.

Sprint argues that based upon *Stolt-Nielsen*, class arbitration proceedings cannot be compelled where, as here, the parties expressly agreed that they would *not* arbitrate on a class-wide basis, and rather agreed to arbitrate with each other on a purely bilateral basis. Moreover, Sprint asserts that "*Stolt-Nielsen* makes clear that the FAA preempts any interpretation of the KCPA that would render the arbitration agreement unenforceable or require class arbitration."

*Stolt-Nielsen*, however, says nothing about preemption or the unenforceability of class preclusion provisions based upon state law. Sprint cites no case that has adopted this reading of *Stolt-Nielsen*. Indeed, those courts that have addressed the relationship between *Stolt-Nielsen* and the preemption of state law have rejected this argument. *See, e.g., Fensterstock v. Education Partners*, 611 F.3d 124, 133 (2d Cir. 2010); *Litman v. Cellco P'shp*, 2010 WL 2017665, at *4 n.5 (3d Cir. May 21, 2010); *Puleo v. ChaseBank USA, N.A.*, 605 F.3d 172, 182 n.5, 194 (3d Cir. 2010); *McArdle v. AT&T Mobility LLC*,

5

2010 WL 1875812, at *1, *2 (N.D. Cal. May 10, 2010); *Mathias v. Rent-A-Center, Inc.*,

2010 WL 3715059, at *5 (E.D. Cal. Sept. 15, 2010).[2]

Sprint has cited only one case that addresses the effect of *Stolt-Nielsen* where the

court has found a class preclusion provision unenforceable. In *Fensterstock v. Education

Partners*, the plaintiff filed a putative class action in the Southern District of New York.

The defendant moved to compel arbitration, based upon an arbitration clause that

included a class action preclusion provision. The court held that the class action

preclusion provision was unconscionable under California law and denied the motion to

compel. On appeal, the Second Circuit affirmed the determination that the provision was

unconscionable and unenforceable. Based upon a severability provision, the defendant

requested that the class preclusion provision be excised and that the case be referred to

[class] arbitration. The court declined, and held, based upon *Stolt-Nielsen*:

> In the present case, the Note's arbitration clause is not silent, but expressly states
> that "the arbitration of Claims *must proceed on an individual (non-class, non-
> representative) basis*." (Note, Terms and Conditions Statement at 4 (emphasis
> added).) Thus, the parties plainly did not agree that arbitration may be conducted
> on a class-wide basis, and we do not see that an order for class-wide arbitration
> can be premised on the Note's severability provision: Our conclusion that a given
> agreement is invalid and unenforceable does not mean that the parties in fact
> reached the opposite agreement. Thus, excising the Note's class action and class
> arbitration waiver clause leaves the Note silent as to the permissibility of class-
> based arbitration, and under *Stolt-Nielsen* we have no authority to order class-
> based arbitration.

Plaintiff was therefore permitted to pursue his claims in court as a class action.

---

[2] Sprint points out that following the issuance of the Stolt-Nielsen decision, at
least one court and several arbitrators have reconsidered and vacated and/or reversed
clause construction awards. I note, however, that none of these cases involved a class
preclusion provision found to be unenforceable under state law.

Relying on *Fensterstock*, Sprint argues that Sprint cannot be compelled to arbitrate on a class-wide basis, and that "[e]ven if the Arbitrator were to give the class action waiver no effect, what would remain is an arbitration agreement that is silent as to the issue of class arbitration (as was the case in *Stolt-Nielsen*), and the Arbitrator would still be compelled to direct the parties to proceed with a bilateral arbitration." This proposal, however, would give Sprint the benefit of a class preclusion provision that has been found unenforceable *and* the benefit of an arbitral forum. In essence, Sprint proposes that the Arbitration Agreement be enforced as written, notwithstanding the finding of unenforceability. Neither *Stolt-Nielsen* nor *Fensterstock* supports such a result.

Had this issue arisen in the posture of the *Fensterstock* case, Sprint would be required to defend a putative class action in court (or, *if plaintiff and Sprint agreed*, could proceed with a class-wide arbitration). I therefore find that Sprint cannot be compelled to proceed with a class-wide arbitration, but also that plaintiff cannot be compelled to proceed with a bilateral arbitration, and must be given the opportunity to pursue his class claims in a court action.

SO ORDERED.

KATHLEEN A. ROBERTS
ARBITRATOR

DATED: March 10, 2011

7

I, Kathleen A. Roberts, do hereby affirm upon my oath as Arbitrator, that I am the individual described herein as Arbitrator and who executed this instrument, which is my PARTIAL FINAL AWARD.

KATHLEEN A. ROBERTS
ARBITRATOR

March 10, 2011

8